# EXHIBIT A

**E-FILED**

## COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT DEPARTMENT

Worcester, SS.

WORCESTER SUPERIOR COURT
CIVIL ACTION: 2285CV 1339C

BETHANY TAYLOR, )
BRENDA McGOVERN, CHRISTINA )
NADEAU, CHRISTINE McWILLIAMS ) COMPLAINT AND
and MICHELLE LAWRENCE, ) DEMAND FOR JURY TRIAL
Plaintiffs )
)
v. )
)
MILFORD REGIONAL MEDICAL )
CENTER, INC., )
Defendant )

### PARTIES

1. Plaintiff Bethany Taylor is an individual who resides in Millville, Worcester County, Massachusetts.

2. Plaintiff Brenda McGovern is an individual who resides in an individual who resides in Woonsocket, Rhode Island.

3. Plaintiff Christina Nadeau is an individual who resides in Chepachet, Rhode Island.

4. Plaintiff Christine McWilliams is an individual who resides in Bellingham, Norfolk County, Massachusetts.

5. Plaintiff Michelle Lawrence is an individual who resides in Blackstone, Worcester County, Massachusetts.

6. Defendant, Milford Regional Medical Center, Inc. ("Milford") is a Massachusetts Corporation with a principal office located at 14 Prospect Street in Milford, Worcester County, Massachusetts.

### JURISDICTION AND VENUE

7. This is an action by the five plaintiffs against their employer, Defendant Milford Regional

Medical Center, Inc., for religious discrimination under Title VII of the Civil Rights Act and G.L. c. 151B.

8. This Court has jurisdiction over this case under G.L. c. 212 § 3 based on the aforementioned claims and that there is no reasonable likelihood that recovery by Plaintiffs would be less than $50,000.

9. Defendant's principal office is a Worcester County address which renders venue proper in accordance with G.L. c. 223 § 1.

10. Plaintiffs have obtained a "Notice of Right to Sue" issued from the U.S. Equal Employment Opportunity Commission and from the Massachusetts Commission Against Discrimination, which allows this Court jurisdiction over the Religious Discrimination claims.

## STATEMENT OF FACTS

### Defendant's COVID-19 Vaccine Policy

11. Defendant's President and CEO notified all of its employees that it would be requiring all employees to be vaccinated against COVID-19 via email on August 5, 2021.

12. Defendant's employees were required to show proof of receiving a COVID-19 vaccine by October 1, 2021.

13. Employees who sought religious or medical accommodation were required to submit their requests on forms provided by the Defendant by September 17, 2021.

14. Any Employees who did not show proof of COVID-19 vaccination by October 1, 2021 were to be placed on unpaid leave until October 15, 2021, however this was never actually provided.

15. If employees on unpaid leave between October 1, 2021 and October 15, 2021 had not received a COVID-19 vaccine within that period of time, they were terminated.

16. With respect to religious exemption requests from its employees, Defendant formed a Religious Exemption Committee to evaluate them.

17. The Defendant did not grant a single religious exemption request to its COVID-19 vaccination policy prior to terminating employees who did not receive a COVID-19 vaccine and were not granted accommodation by October 15, 2021.

18. The Defendant **did provide medical accommodations** to the COVID-19 vaccination policy prior to terminating employees who did not receive a COVID-19 vaccine and were not granted accommodation by October 15, 2021.

**Bethany Taylor's Unlawfully Denied Religious Accommodation Request**

19. Bethany Taylor was employed by the Defendant as a Computed Tomography Technologist, beginning her employment in September of 2008.

20. Since 2008, she was an exemplary employee, receiving exceptional performance evaluations and qualifying for periodic raises.

21. In 2020, Plaintiff Taylor obtained a religious accommodation from Defendant for her religious objection to the Flu Vaccine.

22. After Defendant announced its COVID-19 vaccine policy, Plaintiff Taylor submitted a request for a religious accommodation, just like she had done for the Flu Vaccine the year prior.

23. Plaintiff Taylor supplied all of the information requested by Defendant by using its form provided to employees seeking religious exemption to the COVID-19 vaccines.

24. The form itself provides very little space for employees to elaborate on their religious views which prohibit their being vaccinated with one of the three available vaccines, which were authorized for emergency use.

25. However, Plaintiff Taylor informed Defendant that she adhered to Christian faith and was a follower of Jesus Christ.

26. Further, she articulated that she relies on the Holy Scriptures found in the Bible as God's Word, and that she believes that her body is a temple of the Holy Spirit and that by injecting herself with one of the three available COVID-19 EUA vaccines, she would be violating her Christian beliefs.

27. Plaintiff Taylor informed the Defendant that the ingredients contained within the vaccine including the vaccines' connection to abortion would contradict her sincerely held religious beliefs.

28. Her religious exemption request was denied via email, with Defendant stating that the reason for the denial was that it considered accommodating her religious beliefs to be an undue hardship to its operations.

29. Plaintiff Taylor was terminated for the sole reason that she did not receive a COVID-19 vaccine.

30. She did not receive an opportunity to meet with anyone on the Religious Exemption committee to discuss an accommodation.

**Brenda McGovern's Unlawfully Denied
Religious Accommodation Request**

31. Plaintiff Brenda McGovern began volunteering her time with the Defendant in August of 2011.

32. In October of 2011, she began her employment with Defendant as a Radiology Transporter.

33. While working as a transporter, she was offered a secretarial position with the Women's Pavilion at the Miford Regional Medical Center.

34. Her work evolved and in October of 2014, she began working for the Director of Patient Accounts, wherein she assisted with patient registrations, worked the call center, filled in for ER secretaries and more.

35. In 2020, the functions of her job were adapted to meet the needs of patient safety: for instance, when registering patient information for the Emergency Room, rather than register patients face to face, she would do so via phone.

36. Every job that Plaintiff McGovern performed was able to be conducted without face-to-face interaction with patients.

37. On September 15, 2021, she submitted her request for religious accommodation using Defendant's Religious Exemption Request Form.

38. Attached to her request, she provided materials that outlined her sincerely held religious beliefs as a follower and member of the Congregation of Universal Wisdom, namely that no member of her faith may inject unnatural substances into their body, based on the belief that God and nature are one.

39. Included with her documents supporting her religious beliefs was a letter from a Minister of the Congregations of Universal Wisdom stating that its followers should not receive the flu or COVID-19 vaccines based on these core beliefs, and that Plaintiff McGovern was a member of the Congregation of Universal Wisdom.

40. Her religious exemption request was denied via email, with Defendant stating that the reason for the denial was that it considered accommodating her religious beliefs to be an undue hardship to its operations.

41. Plaintiff McGovern was terminated for the sole reason that she did not receive a COVID-19 vaccine.

5

42. She did not receive an opportunity to meet with anyone on the Religious Exemption committee to discuss an accommodation.

**Christina Nadeau's Unlawfully Denied
Religious Accommodation Request**

43. Plaintiff Nadeau began her employment with Defendant as an Oncology Educator/Nurse Navigator in April of 2019.

44. After receiving the announcement of Defendant's COVID-19 vaccine policy, she provided Defendant with her request for accommodation using Defendant's Religious Exemption Request Form.

45. Included with the exemption request form was a letter from her Pastor that articulated how members of the Catholic faith must make the decision to receive a vaccine based upon their moral conscience, with references to the Catholic Church's teachings and doctrines.

46. Also included was a personal letter that she drafted, outlining that her religious conscience, based on her adherence to God's will and the teachings of the Catholic Church, require her to make this decision with an informed conscience by prayer and spiritual discernment.

47. Further, she expressed her strong religious opposition to abortion, and described the COVID-19 vaccines' connection to the practice of abortion, and even went so far as to state that she could be willing to take vaccines that were disconnected from the practice.

48. Her religious exemption request was denied via email, with Defendant stating that the reason for the denial was that it considered accommodating her religious beliefs to be an undue hardship to its operations.

49. Plaintiff Nadeau was terminated for the sole reason that she did not receive a COVID-19 vaccine.

6

50. She was provided with a 15-minute zoom meeting to discuss the denial of her religious exemption request with the Religious Exemption Committee, where she was informed that Defendant was denying all religious exemptions on the basis of hardship.

**Christine McWilliams' Unlawfully Denied
Religious Accommodation Request**

51. Plaintiff Christine McWilliams began her career as an employee of Defendant's in 1999, as a Registered Nurse.

52. After almost 18 years working as a Registered Nurse in the Intensive Care Unit, she transferred to the Post Anesthesia Care Unit, where she worked for about 5 years and at the time of her termination, also worked per diem as an Administrative Clinical Supervisor for nearly 11 years and in the Education Department for approximately 6 years.

53. After receiving the announcement of Defendant's COVID-19 vaccine policy, she provided Defendant with her request for accommodation using Defendant's Religious Exemption Request Form.

54. Included with the request form, she submitted a personal statement that clearly articulated her religious objection to the COVID-19 vaccines, namely that she is a practicing Catholic and that she has an obligation under her religion to obey her conscience, which includes refusing vaccines that are connected to abortion and the use of mRNA technology, and further that a Catholic must make the decision based on their moral conscience and should not submit to vaccination unless it is voluntary.

55. Further, she submitted a letter from her pastor, Rev. Laurence Brault, who stated that he met with her and discussed this matter with her and provided spiritual counseling and direction.

56. Rev. Brault stated that "there is a strong spiritual reason for her not being vaccinated," and that he did "do[es] believe that there is just reason for Christine to object to being vaccinated."

57. Her religious exemption request was denied via email, with Defendant stating that the reason for the denial was that it considered accommodating her religious beliefs to be an undue hardship to its operations.

58. Plaintiff McWilliams was terminated for the sole reason that she did not receive a COVID-19 vaccine.

59. She was provided with a 15-minute zoom meeting to discuss the denial of her religious exemption request with the Religious Exemption Committee, where she proposed that she could work remotely and was informed that Defendant was denying all religious exemptions on the basis of hardship.

**Michelle Lawrence's Unlawful Religious Accommodation Request**

60. Plaintiff Lawrence also worked in the Post Anesthesia Care Unit and also worked in the Intensive Care Unit.

61. She worked for Defendant as a Registered Nurse from 2009 until she was terminated in 2021.

62. After receiving the announcement of Defendant's COVID-19 vaccine policy, she provided Defendant with her request for accommodation using Defendant's Religious Exemption Request Form.

63. Included with her exemption form was a statement that she wrote, articulating to the Defendant that she was a practicing Wiccan.

8

64. She went on to describe the tenets of the Wiccan faith, including the core belief that humans are made as mother nature intended them, and that mother nature will provide us with what we need to survive.

65. She further articulated that she conforms her life to these beliefs, including using homeopathic remedies, etc. and that taking one of the three COVID-19 vaccines would violate her Wiccan beliefs and practices.

66. Her religious exemption request was denied via email, with Defendant stating that the reason for the denial was that it considered accommodating her religious beliefs to be an undue hardship to its operations.

67. Plaintiff Lawrence was terminated for the sole reason that she did not receive a COVID-19 vaccine.

68. She was provided with a 15-minute zoom meeting to discuss the denial of her religious exemption request with the Religious Exemption Committee, where she was informed that Defendant was denying all religious exemptions on the basis of hardship.

**Plaintiffs' Beliefs are Sincere**

**(Christian Beliefs)**

69. Plaintiffs Taylor, McWilliams and Nadeau have sincerely held religious beliefs that preclude them from complying with Defendant's COVID-19 Vaccination Policy because of the connection between all three COVID-19 vaccines (in their origination, production, development, or testing), and the cell lines of aborted fetuses.

70. They believe, fundamentally, that all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life.

9

71. These sincerely held religious beliefs are rooted in the Bible's teachings[1], in that God forms children from the womb, personally knows them prior to their birth, and that therefore all life is sacred from the moment of conception:

   a. "Thou shalt not kill[2]." *Exodus* 20:13 (KJV);

   b. "Ye have heard that it was said of them of old time, Thou shalt not kill; and whosoever shall kill shall be in danger of the judgment…" *Matthew* 5:21 (KJV);

   c. "Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee…" *Jeremiah* 1:5 (KJV);

   d. "I was cast upon thee from the womb: thou art my God from my mother's belly." *Psalms* 22:10 (KJV);

   e. "For thou has possessed my reins: thou has covered me in my mother's womb. I will praise thee; for I am fearfully and wonderfully made: marvelous are thy works; and that my soul knoweth right well." *Psalm* 139:13-14 (KJV);

   f. "Thine eyes did see my substance, yet being unperfect; and in thy book all my members were written, which in continuance were fashioned, when as yet there was none of them." *Psalm* 139:16 (KJV);

   g. "The Lord that made thee, and formed thee from the womb…" *Isaiah* 44:2 (KJV);

   h. "Thus saith the Lord, thy redeemer, and he that formed thee from the womb, I am the Lord that maketh all things." *Isaiah* 44:24 (KJV);

   i. "The Lord hath called me from the womb; from the bowels of my mother hath he made mention of my name." *Isaiah* 49:1 (KJV);

   j. "The Lord that formed me from the womb to be his servant." *Isaiah* 49:5 (KJV);

---

[1] See: https://www.gotquestions.org/abortion-Bible.html
[2] *Exodus* 21:22-25 explains that this includes babies inside of the womb.

10

    k. "Let us make man in our image, after our likeness... So God created man in His own image; in the image of God created He him; male and female created he them." *Genesis* 1:26-17 (KJV).

72. The Pfizer, Moderna, Johnson & Johnson COVID-19 vaccines were derived from, produced, manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

73. Johnson & Johnson used aborted fetal cell lines to produce and manufacture its vaccines[3].

74. Moderna and Pfizer/BioNTech COVID-19 vaccines also trace their origins to research on aborted fetal cell lines, as they are ultimately derived from research and testing on aborted fetal cell lines: "Early in the development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein[4]."

75. Pfizer and Moderna's use of aborted fetal cells in the "proof of concept" phase of their COVID-19 mRNA vaccine development was also confirmed by the Louisiana Department of Public Health[5].

76. Plaintiffs Taylor, McWilliams and Nadeau believe that by partaking in these vaccines, they are either defiling their bodies with the product of an unholy act or are complicit in furthering the practice of abortion.

77. In that all three of the subject vaccines are developed and produced from, tested with, researched on, or otherwise connected to aborted fetal cell lines HEK-293 and PER.C6,

---

[3] See: https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells; and https://www.science.org/doi/full/10.1126/science.368.6496.1170.
[4] https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf
[5] https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf

11

Plaintiff Taylor, McWilliams and Nadeau's' sincerely held religious beliefs prohibit them from taking the vaccines.

78. Plaintiffs Taylor, McWilliams and Nadeau, as Christians, believe that Jesus Christ died on the cross for our sins, was resurrected three days later, and that when He ascended into Heaven, He sent the Holy Spirit to indwell His believers and to guide them in all aspects of their lives. *John* 16:7 ("Nevertheless I tell you the truth, it is expedient for you that I go away: for if I go not away, the Comforter will not come unto you; but if I depart, I will send him unto you." (KJV)).; *John* 14:26 ("But the Comforter, which is the Holy Ghost, whom the Father will send in my name, he shall teach you all things, and bring all things to your remembrance, whatsoever I have said unto you." (KJV)).

79. They believe the Holy Spirit was given them by God guide them into all truth. See *John* 16:8,13 ("And when he is come, he will reprove the world of sin, and of righteousness, and of judgment . . . when he, the Spirit of truth, is come, he will guide you into all truth: for he shall not speak of himself; but whatsoever he shall hear, that shall he speak: and he will shew you things to come." (KJV)).

80. As Christians, they believe that they will receive all answers to questions such as whether to take a COVID-19 vaccine through prayer. See *Philippians* 4:6-7 ("but in everything by prayer and supplication with thanksgiving let your request be made known to God. And the peace of God, which passeth all understanding, shall keep your hearts and minds through Christ Jesus." (KJV)).

81. Plaintiffs Taylor, McWilliams and Nadeau, after prayer regarding taking the COVID-19 vaccines, sincerely believe that the Holy Spirit has not given them peace or comfort to accept any of the three currently available COVID-19 vaccines.

**(Congregation of Universal Wisdom)**

12

82. Plaintiff McGovern's beliefs, centered around following universal wisdom as the "Supreme Master of all levels of creation and all life of the universe," uses this wisdom as a "guide or principle by which all mankind should aspire to live[6]."

83. Furthermore, the Congregation of Universal Wisdom obligates its members to place their own spiritual beliefs above those who would dictate the health decisions of others[7].

84. Plaintiff McGovern sincerely believes that, in accordance with the tenets of her faith, which considers sacrilege the "injection into the body of medication or other matter of substances that defy natural law," that taking a COVID-19 vaccine would be committing sacrilege and would violate her conscience.

**(Wicca)**

85. Plaintiff Lawrence adheres to the Wiccan faith and relies on the god and goddess (which are the center of everything in the Wiccan faith) for guidance on decisions that could potentially violate her spiritual beliefs.

86. After much prayer and reliance on her Wiccan rituals and practices, Plaintiff Lawrence's religious conscience was informed that she should not take one of the available COVID-19 vaccines.

87. As communicated to the Defendant, Lawrence follows natural practices in her lifestyle with the aforementioned beliefs as the foundation.

**Defendant Faced No Hardship**

88. Asymptomatic transmission of COVID-19 is highly unlikely. See Madewell, Z. J., Yang, Y., Longini, I. M., Halloran, M. E. & Dean, N. E. (2020). *Household transmission of SARS-CoV-2:*

---

[6] The tenets of the Congregation of Universal Wisdom's Faith can be found here: https://seekwisdom.life/beliefs/.
[7] "No court or civil legal body or any tribunal anywhere in the universe shall proclaim itself master in judgment over the physical, mental or spiritual health of any living thing. The only true judge is God in harmony with universal forces and no other living being possess the intellect to judge such matters. The Congregation in adherence to their spiritual belief and religion are bound by their moral obligation to make resistance and refusal to such judgments in keeping with their committed belief and practice."

13

*A systematic review and meta-analysis.* JAMA NETWORK OPEN, *3*(12), 1-17. https://doi.org/10.1001/jamanetworkopen.2020.31756; Cao, S., Gan, Y., Wang, C., Bachmann, M., Wei, S., Gong, J., Huang, Y., Wang, T., Li, L., Lu, K., Jiang, H., Gong, Y., Xu, H., Shen, X., Tian, Q., Lv, C., Song, F., Yin, X. & Lu, Z. (2020). *Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China.* NATURE COMMUNICATIONS, *11*(1), 5917. https://doi.org/10.1038/s41467-020-19802-w; Buitrago-Garcia, D., Egli-Gany, D., Counotte, M. J., Hossmann, S., Imeri, H., Ipekci, A. M., Salanti, G. & Low, N. (2020). *Occurrence and transmission potential of asymptomatic and presymptomatic SARS-CoV-2 infections: A living systematic review and meta-analysis.* PLOS MEDICINE, *17*(9), e1003346. https://doi.org/10.1371/journal.pmed.1003346; Cevik, M., Tate, M., Lloyd, O., Maraolo, A. E., Schafers, J. & Ho, A. (2021). *SARS-CoV-2, SARS-CoV, and MERS-CoV viral load dynamics, duration of viral shedding, and infectiousness: A systematic review and meta-analysis.* THE LANCET, MICROBE, *2*(1), e13-e22. https://doi.org/10.1016/s2666-5247(20)30172-5; Peirlinck, M., Linka, K., Costabal, F. S., Bhattacharya, J., Bendavid, E., Ioannidis, J. P. A. & Kuhl, E. (2020). *Visualizing the invisible: The effect of asymptotic transmission on the outbreak dynamics of COVID-19.* COMPUTER METHODS IN APPLIED MECHANICS AND ENGINEERING, *372*(1), 113140. https://doi.org/10.1016/j.cma.2020.113410.

89. Plaintiffs' presence at the workplace unvaccinated while wearing a facemask, checking their temperature, monitoring for symptoms, physically distancing from patients and employees when possible would not pose a "direct threat." *See*: Baker, M., Rhee, C., Fiumara, K., Bennett-Rizzo, C., Tucker, R., Williams, S., . . . Klompas, M. (2020). COVID-19 infections among HCWs exposed to a patient with a delayed diagnosis of COVID-19. *Infection Control & Hospital Epidemiology, 41*(9), 1075-1076. https://doi:10.1017/ice.2020.256 (low infection

rate amongst healthcare workers exposed to COVID-19 infected patients); Meghan A Baker, Karen Fiumara, Chanu Rhee, Sarah A Williams, Robert Tucker, Paige Wickner, Andrew Resnick, Michael Klompas, CDC Prevention Epicenters Program, Low Risk of Coronavirus Disease 2019 (COVID-19) Among Patients Exposed to Infected Healthcare Workers, *Clinical Infectious Diseases*, Volume 73, Issue 7, 1 October 2021, Pages e1878–e1880, https://doi.org/10.1093/cid/ciaa1269 (low infection rate amongst healthcare workers exposed to COVID-positive patients); Cavanaugh AM, Spicer KB, Thoroughman D, Glick C, Winter K. *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021.* MMWR MORB MORTAL WKLY REP 2021;70:1081-1083. https://doi.org/10.15585/mmwr.mm7032e1 (vaccinated racetrack worker study showing that vaccinated workers were over two times **more likely** to be reinfected than unvaccinated workers); Vitale, J., Mumoli, N., Clerici, P., de Paschale, M., Evangelista, I., Cei, M. & Mazzone, A. (2021). *Assessment of SARS-CoV-2 reinfection 1 year after primary infection in a population in Lombardy, Italy.* JAMA INTERNAL MEDICINE, *181*(10), 1407-1409. https://doi.org/10.1001/jamainternmed.2021.2959 (reinfection is incredibly rare); Elijah, S (2022) *On What Basis Did Pfizer Claim 95%,* https://brownstone.org/articles/on-what-basis-did-pfizer-claim-95/ (Analysis of publicly-released Pfizer trial data shows **an actual effectiveness of 12%,** compared to Pfizer's claim of 95%).

90. As the science has progressed on the study of COVID-19, studies have shown that there is a very small statistical difference between vaccinated and unvaccinated individuals when it comes to transmission of the virus. *See* Gunter, Kampf, (November 19, 2021), *The Epidemiological Relevance of the COVID-19-Vaccinated population is increasing.* https://doi.org/10.1016/j.lanepe.2021.100272 (39% of infected are fully vaccinated); Brown CM, Vostok J, Johnson H, et al. *Outbreak of SARS-CoV-2 Infections, Including COVID-*

15

*19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings* — Barnstable County, Massachusetts, July 2021. MMWR Morb. Mortal Wkly. Rep 2021;70:1059-1062. http://doi.org/10.15585/mmwr.mm7031e2 **(Roughly 3/4 of all infected from outbreak of 469 cases were vaccinated).**

91. Plaintiffs' mask and thermometer are items that they could simply purchase themselves for less than $20, therefore their accommodation would not pose a financial hardship to the Defendant.

92. Massachusetts Health and Hospital Association reports that there are an estimated 19,000 open acute care hospital positions across Massachusetts[8].

93. With respect to operations, if Plaintiffs were to require quarantine, the loss of staffing for the quarantine period would still prove less than perpetual vacancies due to not allowing vaccinated employees to work at Defendant's hospitals.

## COUNT I
## (Title VII Violation)
## 42 U.S.C. § 2000e, *et seq.*

94. Plaintiffs realleges and adopts each and every allegation in paragraphs 1-93 as if fully set forth herein.

95. Title VII of the Civil Rights Act prohibits Defendant from discriminating against its employees on the basis of their sincerely held religious beliefs.

96. Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

97. Plaintiffs informed Defendant of those beliefs and requested a religious exemption and reasonable accommodation from the vaccine policy.

---

[8] https://www.mintz.com/insights-center/viewpoints/2146/2022-11-22-health-care-workforce-shortages-persist-massachusetts

16

Date Filed 11/23/2022 11:07 AM
Superior Court - Worcester
Docket Number

98. Defendant failed to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests.

99. Irrespective of the interactive process, Defendant failed to provide Plaintiffs with a religious exemption and reasonable accommodation, thereby discriminating against Plaintiffs because of their religious beliefs.

100. Further, Defendant did provide medical exemptions to its employees despite claiming that religious exemptions would pose an undue hardship to its operations.

101. Defendant's failure to provide religious exemption and accommodation to Plaintiffs has caused them harm.

102. Once an employee demonstrates that their religious belief conflicts with an employment condition, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

103. Defendant did not demonstrate that accommodating Plaintiffs' religious beliefs would have resulted in undue hardship, especially given the fact that Defendant provided medical exemptions.

104. Defendant's accommodation of one group of employees who requested exemption from the policy, but denial of accommodation if the request was for sincerely held religious beliefs constitutes religious discrimination.

105. By failing to engage in a meaningful interactive process, offer any reasonable accommodation, or demonstrate an undue hardship, Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

Wherefore, Plaintiffs requests relief against Defendant as set forth in their prayer for relief.

17

## COUNT II
### (Religious Discrimination)
### M.G.L. c. 151B

106. Plaintiffs realleges and adopts each and every allegation in paragraphs 1-105 as if fully set forth herein.

107. G.L. c. 151B §4 prohibits Defendant from discriminating against their employees on the basis of their sincerely held religious beliefs.

108. Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

109. Plaintiffs informed Defendant of those beliefs and requested a religious exemption and reasonable accommodation from the vaccine policy.

110. Defendant failed to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests.

111. Irrespective of the interactive process, Defendant failed to provide Plaintiffs with a religious exemption and reasonable accommodation, thereby discriminating against Plaintiffs because of their religious beliefs.

112. Defendants' failure to provide religious exemption and accommodation to Plaintiffs has caused Plaintiffs harm.

113. By failing to engage in a meaningful interactive process, offer any reasonable accommodation, or demonstrate an undue hardship, Defendant's discriminatory actions were intentional and/or reckless and in violation of G.L. c. 151B.

Wherefore, Plaintiffs requests relief against Defendant as set forth in their prayer for relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court:

114. Award money damages, punitive damages, costs and attorney fees to Plaintiffs and others similarly situated to be proven at trial.

115. Award any other relief this Court deems equitable and just.

**Plaintiffs demand a trial by jury.**

Plaintiffs, by their attorney,

/s/ Ryan P. McLane
Ryan P. McLane, Esq. (BBO: 697464)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
E-mail: ryan@mclanelaw.com